We'll hear argument next this morning in WILDEARTH Guardians against Haaland, Secretary of the Interior, and Ms. Forsyth. I please the Court, Elizabeth Forsyth, on behalf of the Center for Biological Diversity at Helens. I'd like to reserve two minutes of my time for rebuttal. We're here today to ensure that the Mexican wolf, one of North America's most endangered mammals, is actually set on a course towards recovery. I plan to address the mootness argument as well as whether courts may review a recovery plan for whether it actually provides for conservation survival. Mr. Bishop will address the issue of whether the delisting criteria in a recovery plan must comply with the best available science mandate. Turning first to mootness, this case is not moot. Indeed, it's on all fours with 350 Montana. Just like in that case, there is still a controversy here for which effective relief may be granted. That's because the issues on appeal were not altered by the district court's remand. The district court ordered certain site-specific management actions to be added to the plan to address illegal killing, but the recovery plan otherwise remained unchanged. Indeed, it explicitly states that the recovery plan maintains the recovery strategy criteria and actions from the previous version of the plan. This puts this on all fours with 350 Montana. There, the district court remanded an environmental assessment to add additional analysis of terrain derailments. While the case was pending on appeal, a revised EA was issued. Nevertheless, this court held that the challenge to the environmental assessment was not moot because the portions of the assessment at issue on appeal had not changed. That's essentially the same circumstances that we have here. So, I mean, I guess I don't disagree that this seems very much like 350 Montana. How do you explain the rule in that case, you know, doctrinally? Because, I mean, normally we ask, you know, can we grant effective relief to you? And the relief that you sought in the complaint is, you know, something with respect to the 2017 plan, and that no longer exists. And now there's this other plan, and it is, as you say, similar in every relevant respect, but it's still a different plan. So how does that work? Sure, the relief that we sought also included injunctive relief to order the service to produce a legally compliant recovery plan. So in that sense, the relief that's requested is absolutely the same. And that accords with 350 Montana. Of course, there the complaint was specific to the earlier EA, and the court was able to find that because the relevant portions were simply carried over, there was still a case or controversy that the court could grant a relief in accordance with. I'd like to turn now to whether this court may review a recovery plan for whether it provides for conservation survival. Whether the ESA requires recovery plans to provide for conservation survival and whether a court can hear a challenge for the service's failure to do so is a straightforward question of statutory interpretation. The citizen suit provision of the ESA allows suit to challenge any failure of the service to perform an act or duty that is not discretionary. So the question for this court, is there a non-discretionary duty in Section 4F for the service to provide for conservation survival in a recovery plan? The answer to that question is clearly yes, based on the plain language of Section 4F. That provision reads, the secretary shall develop and implement plans for conservation and survival of endangered species and threatened species.  Shall is an indicator of a non-discretionary duty, not of discretion. Thus, Section 4F creates a mandatory duty that is enforceable by a citizen suit, and the court has jurisdiction to hear a claim that the plan fails to do so. Can you mention the Defenders of Wildlife v. Jewell? The case regarding the 1982 recovery plan was also challenging whether the recovery plan provided for conservation, and it appears in that case, it's a little bit hard to tell from the decision, but that the Fish and Wildlife Service only raised time bar as the jurisdictional subject matter challenge. Did they not make the same argument there as they are making here? They made the same argument there, and there the district court parsed the language of the statute correctly and said, the statute says that the plan shall provide for conservation and survival. In that case, it was undisputed that the 1982 recovery plan had only provided for survival and not conservation, and so the district court there correctly found that there was jurisdiction to hear the claim that the plan, that there was a failure to provide for conservation. That's the same inquiry we're asking of the district court here. And I'll note here, again, it makes sense that Congress would intend for there to be a mandatory duty to provide for conservation and survival for a recovery plan, because recovery plans are the road map for all other species decisions under Section 4 and in the ESA. And if this road map doesn't actually provide for conservation and survival, then threatened and endangered species may remain imperiled or, at worst, decline towards extinction. Well, what's the end point? It's to have a determination of conservation and survivability. And at the beginning for your road map, the agency can say, here's where we want to be. But is your argument that in order to challenge in the court, you have to know what the end point is, and there is not one, according to you, in this plan? The end point has to be in accordance with the listing factors, right? So you're trying to get the species to an end point where it can be removed from Endangered Species Act protection. So that has to be end points that would set the species on continued recovery without further engagement from the agency. Can you challenge how do you get to the end point? We can challenge the end point based on the standard APA standards of review that apply to all Section 4 claims. It's the common questions that this court asks in every other context. Has the agency failed to consider an aspect of the problem? Has the agency considered a problem that Congress did not intend it to consider? These are the sorts of judicial review provisions that this court and others routinely apply in other sections, and there's no reason that Section 4F's duty to ensure conservation and survival should be any different. Can I ask about that 1982 case? We don't have similar facts here. Like there the Fish and Wildlife Service conceded in the recovery plan that it didn't provide for conservation. So why would that really be relevant here? Are there any procedures that were not followed? The only distinction there is that we had an omission that conservation was not provided for, but there's no reason that this court should carve out a rule that says you can only challenge a recovery plan to the extent that they're admitting they haven't provided for conservation. Whether the recovery plan provides for conservation is something that this court can review, again, under the well-established standards of review in the Administrative Procedure Act, without needing a defendant admission to be able to do so. I want to be mindful of my time and my colleagues' and reserve the remainder of my time unless the court has further questions. You may. Mr. Bishop. Good morning, Your Honors. May it please the Court. Matthew Bishop for Appellants, Wildlife, and Guardians et al. Your Honors, the goal of the Endangered Species Act is all about recovery to get the species to the point where it can be delisted, and Section 4 of the Endangered Species Act is really the heart and soul of the statute. It includes a number of provisions regarding listing, delisting, critical habitat, five-year reviews, and relevant here, Your Honors, recovery planning. A lot of the decisions ultimately in that section involve some discretion for the agency, whether to list the species or designate critical habitat, but there are a number of requirements, non-discretionary duties, that must be complied with along the way. And it's well settled that having discretion over the ultimate substance of the decision does not give the agency discretion to ignore the required procedures. And one of those required procedures in Section 4, which is the requirement to apply the best available science to these biological determinations in Section 4, it's referred to as the best scientific and commercial data available, but we refer to it as the best available science, and it's a foundational requirement in Section 4. So that's the requirement that governs the ultimate delisting decision, right? But what you need to show is that, well, one, that it's non-discretionary, and two, that the statute makes it applicable to the recovery plan. So can you take us through the statute? Why does the recovery plan have to be based on that? Yeah, you're right. I really do like the roadmap analogy that D.C. Circuit talked about in the Blackwater case and this panel talked about earlier in the case. Recovery plans lay out where the agency needs to go and how best to get there. And where to go is the destination, and that's ultimately recovery. And that's really the most important part of a recovery plan. It requires them to include the actions they're going to take, the time and cost estimates, as well as the delisting criteria. And the criteria is really, they call it recovery criteria or delisting criteria because it tells them what the destination is, you know, in terms of how many populations you need, you need effective migration between the populations, how the threat's going to be resolved. And that delisting criteria, Your Honor, has to be tied to Section 4 delisting. In terms of the need to consider the threats assessment and be based on best developed science because it tells them. Sorry, can we look specifically at the statute language here? Yes. The in accordance with provisions of this section is set off by commas. So tell us why that applies to criteria instead of determination, please. Yeah, Your Honor, I think that the key language in that section, I think there are two phrases, which when met would result in and in accordance with. And I think the in accordance with provisions is referring to the delisting decision that ultimately results in Section 4 or B. So you're conceding it refers to determination? It does. Okay. Right. But the criteria which when met would result in, and I think the D.C. Circuit in the Friends of the Blackwater case, in particular the majority's appendix addressing the dissent, they do a very careful review of that language. And in Judge Friedman's discussion in Fund for the Animals does the same thing where the criteria really targets their values or standards by which the agency determines, and it's like a proxy for delisting, to say, hey, we're there. Maybe we should take the next step and actually do a delisting rule. But it gives them, it lets them know they've made it. And it lets them know, and that's what's so important about it, is all the time and energy the agency puts into getting to recovery between now and then, Your Honor, because ultimately we could challenge a delisting decision and allege it doesn't apply to the best of all science and doesn't apply to the listing factors. That was actually an issue in the grizzly bear case from a few years ago where there was a challenge to the grizzly bear delisting. I guess I'm not clear on what your argument is. Is your argument that because the delisting has to be based on best available science, there's no way to get there unless you use criteria based on best available science? The criteria, the delisting criteria also has to be based on best available science. Why? That's what I'm asking. It informs the delisting. It tells the agency that they've reached their destination, that they've made it, they have the number of populations they need. So it's informative of... But what is in the statutory text that tells me that? I think it's the plain language of that section where it says objective measurable criteria which when met would result in a determination in accordance with provisions of this section, section 4. Your Honor, I think that is the cross-reference to subsection 4a, b, and c. And I think this court's decision in Coos County is really spot on because it was the same issue there. That issue there was a five-year status review. And what the court said was it doesn't require... There's nothing explicit in section 4c that says you have to apply the best available science. But it actually includes the same in accordance with clause. And there they said it's a reference, a cross-reference, to applying the best available science for five-year status reviews, which, by the way, just like recovery plans, they're non-binding, but they're very informative of the delisting process. And therefore, it would be illogical, actually, to decouple them from the best available science or the threats factors. I think Coos County is a really helpful case for us because it's the exact same situation, exact same cross-reference from in accordance with. I don't think Congress's inclusion of that phrase was inadvertent. I think they knew they were cross-referencing the need to make sure these delisting criteria, the destination, applies the best available science. Could you address our Children's Earth Foundation under the Clean Water Act case where we seemed like a sort of parallel statutory structure where you had to do the review of the Affluent Guidelines in accordance with subsection B, and subsection B had the best technology requirement, and we said that part is non-discretionary, but the review of it, even though it says in accordance with, isn't non-discretionary. Yeah, I think it's distinguishable, Your Honor, because I think in those situations, in that case, in particular, also like the Clean Air Act case that recites it, the previous Waters Gardens case, in those situations you have a duty that's really subject to competing interpretations, both of which may be plausible, and some of which are subject to competing interpretations or inferences. And I think here it's pretty clear what Congress meant. I don't think it was unambiguous when they said delisting criteria, which when met would result in delisting in accordance with. And I think this case is more analogous to the Coos County case. They use exactly the same phrase in the same section of the statute. And I think when you look at that Clean Water Act case that you referenced or the Clean Air Act case, it is confusing. I mean, I actually was reviewing it, too. The Clean Air Act case had two separate duties, but it was unclear exactly how you were going to interpret it, and there were a number of inferences you could make, both of which were kind of plausible. I don't think that's really the situation here because the federal government and the district court in this case basically read out the in accordance with provision and which one met provision. And I feel like the only district court cases, there's a split in the district courts on this issue, the cases the district courts that actually took a closer look at the plain language and actually went through the tools of statutory interpretation found that there was, of course, you need to tie the criteria to the delisting factors and the best available science in a plain reading of that. And I would add, finally, you're on. Sorry, I didn't mean to. No, no, good meeting. Finally, I would say that to the extent there isn't any ambiguity, I think the legislative history is very helpful and spot on. We know there were a number of amendments, one of which was to require economic analysis for these recovery plans, and the Senate has debated the issue and ultimately came to a decision that no. But if there's ambiguity, you lose under the clear statement rule, don't you? Well, if there's ambiguity, I guess just in terms of if the plain language is ambiguous in terms of what Congress meant, then I think it's fair for the court to look at the legislative history and the overall purpose. But you're right, Your Honor. Our position is the language and the text itself speaks for itself. And I guess I would like to conclude by saying this isn't just our interpretation. If you actually look at the agency's own recovery planning policy, which, by the way, is required by Section 4H, they don't have regulations on recovery planning. They just have recovery planning guidance. But if you actually look at, which is in the record, the agency's own guidance, their interpretation is consistent with ours, which is recovery plans do need to address the threat factors and do need to be based on the best of both sides. Can I ask you, in the statute F-1, what work is the language to the maximum extent practicable doing here? So how does that affect the duty? Yes. Does it make it discretionary? No, if they made a determination that it was impractical or infeasible to develop the criteria, then they would be relieved of the duty. But they never made that finding here, Your Honor. And there's a similar language for critical habitat as well. So I think they would have to make – and there are cases where the – there are situations where the agency has determined it was impracticable for them to actually try to designate criteria for various reasons for different kinds of species. And in some situations, I do think that makes sense. But that wasn't a determination they made in this case. And so in the absence of actually making that determination, I think the duty still exists. Do you want to save the remainder of your time? I would. Thank you, Your Honor. Ms. Mishra? Good morning. May it please the Court, Dean Mishra for the United States. This is a now moot challenge to the 2017 Mexican wolf recovery plan, which has been replaced by the 2022 plan and so is no longer effective even to the extent that any such nonbinding statement of intention or roadmap document of this type would be. Since the 2017 plan, there's been vast improvement, including more than doubling of the U.S. Mexican wolf population, a fact that should give this Court some comfort about the direction that things are going in here. I'll start with the mootness issue as that determination is dispositive of whether other issues may be reached. As discussed in the briefing and motions practiced, the challenge plan has been replaced. The challenge is now moot. The contrary suggestion misunderstands the governing precedent and the nature of the recovery planning process because the Act makes the new plan the only effective one to the extent that any undisputedly nonbinding plan affects plaintiff's concrete interests. I'd be happy to answer any particular questions about mootness. I saw that there were questions asked to some degree about mootness with respect to 350 Montana. So if it's all right, I'd like to address that decision. As I understand 350 Montana, as the government has explained in the papers, 350 Montana involved a distinguishable situation where there was express incorporation of the old document. And that was how 350 Montana distinguished other cases that had come to different conclusions, those cases being along the lines of the many cases that we cited in the papers that talk about when a new document replaces the old one and that new document is the only one that the agency would be looking to in any sense, for example, under Native Village cited in the papers, why it would be that the old document is not, in a sense, still live for purposes of review. And so 350 Montana allows for the potential for it to stay live only because it was expressly incorporated into that new document. That's not what happened here with the 2022 recovery plan. The 2022 recovery plan has its own contents, including actually a number of substantial changes with respect to the old document. But most importantly, it is, in effect, its own new document that replaces the old one. And so relief that they would need to seek would be directed towards that, as opposed to, for example, the old one. But none of the... Correct me if I'm wrong on this, but none of the provisions that they're challenging here changed between the two plans, did they? So the site-specific management actions had changed, and with respect to the site-specific management actions, there was material provided in the 2022 plan that actually affects their challenges with respect to the other parts of the plan. So, for example, there was express rationale provided, including that references scientific basis, and there was about... Over 20 pages, about 30% of the new document, includes public notice and comment responses, right? So the comments and responses that talk about some of the issues with respect to site-specific management actions that actually inform and strengthen the explanation with respect to the challenges that they've made. So, for example, with respect to scientific basis, and with respect to issues of human-caused mortality, pages 65 to 66 of the new plan, for example, address some of those issues, and issues with respect to the model, talk about why there was the most comprehensive data available, that it was better than recommendations from scientists studying wolves in other areas, talking about how there is data that's being taken into account for the model that is based on the Mexican wolf program, for example, as opposed to Yellowstone wolves, et cetera. And so there's material that's in the 2022 recovery plan, in addition to the administrative record, which would be substantially different for the 2022 plan, because, as I mentioned, there was public comment taken in, including comments that were made by some of the plaintiffs. So they submitted comments, and there's response to that in the 2022 recovery plan document. So with respect to some of their challenges, it's a very different case, and would need to be a new case, that hasn't yet been brought with respect to the 2022 plan, which is the only document, as I explained, that the agency would be looking to at all, to the extent that it looks to it as a statement of intention, in the ways that it's described and comprehended by the statutory meaning here. And I believe you also said that 350 Montana is different because of express incorporation, as opposed to... Why does it matter whether there's an express reference as opposed to simply repeating the relevant language? Right. So the idea is, if it's repeating, then the new document is the document you would look to, and you'd need to have a challenge with respect to the new document. It doesn't keep alive the old document, which is what their challenge was directed towards. So, for example, in terms of describing what the challenged action was for Article III purposes, in terms of tracing their injury to that challenge, their injury was traced to the 2017 plan. The 2017 plan is not what the 2022 plan is keeping live in the way that 350 Montana would do it. It's actually its own document, and it's talking about maybe some same things, but that's some of what happened in Idaho Department of Fish and Game, where there may be repetition, and there might be some overlap, but that doesn't actually undercut the fact that it's a new document and that the Article III interests cannot trace, in a sense, to the old document via that new document. And is the existence of a non-discretionary duty under the Citizen Institute provision, is that a merits question, in your view? So it goes to the waiver of sovereign immunity, and so that's why it brings in, for example, this case law that has required that it be a clear-cut non-discretionary duty. We do think that that is probably jurisdictional. It's certainly a threshold issue where you could deny an audience to the merits of the case on that basis, but we also think that this case is moot, and as a matter of jurisdiction, you need not get denied. So your understanding of the relationship between the two issues is that we would, if we were to rule for you on the latter question, we would not be required to reach mootness first? I think that's right. Under the Supreme Court's, for example, SEMTEC decisions, I think there's some other decisions that talk about threshold issues where if you're denying proceeding onto the merits, so if you're ruling for the government on those issues, then you might not need to get to the Article III mootness issues, but we also, you know, we're in the interest of candor to the court. Our understanding is that the old challenge is moot, so we're presenting that first. I'd be happy to turn to the nondiscretionary duty issues. I think there are some points to potentially clarify based on that. I think that the discussion, for example, of the conservation and survival point and that it needs to be, according to the plaintiffs, actually providing for conservation and survival kind of runs up against all of the extensive case law in this circuit and others that talk about how you need to have, first, a clear-cut nondiscretionary duty and how recovery plans, especially because they are these nonbinding documents that don't have legal effect in the same way, such that this court, for example, recently confirmed there's not APA review with respect to them because they don't present final agency actions in that sense of binding legal effect, et cetera, that you don't actually go into those recovery plan things typically for the substance, so there's a lot of case law in the Supreme Court. How do you square that with the Defenders of Wildlife v. Jewel? Right, so Defenders of Wildlife v. Jewel is, as I understand it, a district court ruling. What I'm trying to explain is that... The same district court that issued the rulings that are at issue here, right? It's Judge Zips in Arizona. Understood, but I think, as Your Honor explained and as what came out in some of the discussion, it went to the issue of the 1982 recovery plan, which was undisputedly not something that actually was even for conservation. So as a matter of... But if there's no jurisdiction, what does it matter? If there's no jurisdiction, it shouldn't be reviewable at all, right? So there would potentially be a distinction. We think it may not be the case that you would reach... You know, whether you reach to the question of whether the plan is for conservation and survival. The point is still that that's a purpose-oriented provision, and so it's not a clear-cut nondiscretionary duty to actually provide for conservation and survival in any event, and so Defenders of Wildlife v. Jewel, even to the extent that that district court decision were followed here, that district court decision was really only saying that the plan needs to be for something that that plan undisputedly, conceitedly, did not provide for because it preceded, for example, some of the requirements in the ESA that it provide for some of those criteria, et cetera. And so what I'm trying to say is that, as a matter of how you would apply needing to have a clear-cut nondiscretionary duty, it is not the case that the shall, for example, the requirement, extends to actually providing for conservation and survival as a matter of something informed by hindsight bias. It would be that you have to develop a plan, you have to have a plan, and it has to be a plan for that goal, but it doesn't have to actually necessarily achieve that goal, even though, of course, the agency would be trying to have it achieve that goal. And this is consistent with the broader structure of the statute, including 4F, because 4F is talking about recovery planning as being this kind of preliminary stage, as being the statement of tension at one point in time, and this is consistent with what the D.C. Circuit's position in understanding this statute was as well. So you lost me. The whole purpose of the plan is they make a determination that there is a species that is at risk. There were seven of these Mexican wolves that they were aware of. So they make a decision, and that decision the agency has to do is they say, we are going to protect it to see that there is conservation and survival of the species, or they have a decision that says nothing we can do is going to make any difference. If they do the former, how do they get to the conservation and survival in the absence of knowing where they're going? Right. So we do believe that they know where they're going, and the agency has provided a way that it understands, it's provided the plan, it has a road map, it has those criteria, it has those items that are described in Section 4F. But the issue is just that they want to take issue with how those specific items are being done. And as I think that your question before Judge Mollet went to, there's a lot of case law that talks about how the how of it or the specifics of it or the contents and substance of it are not what is reached by the citizen suit review, which has to be for the nondiscretionary duties. So there is still discretion in terms of the how, in terms of the specifics that are selected by the agency as what the agency understands to be what would achieve that conservation and survival. And that's consistent with Coos County, that's consistent with the Supreme Court's Bennett distinction, making those kinds of distinctions between the substance as opposed to the specific requirements that are very, very clearly, as a matter of the case law, requiring there to be a clear-cut nondiscretionary nature of the duty be reachable by this review. Do you think there's any scope or any permissible scope of review of the substance of it? I mean, suppose they've said, you know, our plan for conservation and survival is, you know, we're going to have, you know, two animals left, right? Or, you know, something that just clearly would not work. That would not be reviewable, in your view? As long as the agency says it's a plan for conservation and survival. Certainly there might be a point at which it would just, on its face, not be a plan for conservation and survival. But more importantly, even with respect to that language, which we do think is at least sufficiently ambiguous, that you would have to decide there would not be a clear-cut nondiscretionary duty with respect to it that would apply here. We also think that the parts of the statute that talk about needing to have, you know, site-specific management actions, for example, that's not something that we've contested. And the agency, for example, has gone to the trouble of developing this 2022 plan in order to improve on that very dimension that the district court took some issue with. And so we don't dispute that there might be parts of what goes into review of recovery plans that may fit to the nondiscretionary duty. It's just not the particular types of challenges that these plaintiffs have presented here. I guess I'm still a little bit confused, and I'm sorry, I don't want to waste too much time on this question, but, you know, your position is that the substance of whether a recovery plan provides for conservation is a discretionary one. That's, like, really the substance of the ultimate decision. But in 2015, you said that was a reviewable decision for which, or the district court found, the same district court that's involved here, found that that was a reviewable decision. So I'm just a little bit having trouble how to square the current case with an earlier iteration of these wolf recovery plans. Sure. So the first point is that as a matter of what the law that applies, it needs to be a clear-cut nondiscretionary duty. And when you look at the language of 4F, the question that was presented in that district court opinion was a different one because it was a question of a plan, an older plan, that admittedly did not even provide for conservation in that sense, right? So the idea was that it wasn't designed just to do more than survival. And that's not at issue here. There's no dispute here, for example, that there are objective measurable criteria, that there are goals set. It's just that the plaintiffs take issue with the specific goals that are set. They would like different ones. They take issue with the specific contents of how the agency has assessed the science carefully and decided that it wants to proceed. And I'll note with respect... Okay, thank you. Can I ask you? I am a little bit concerned that outside the context of litigation, the service's position has been that the criteria has to be And so let me just walk you through two documents in particular that are in the record. And, you know, one is the Interim Endangered and Threatened Species Recovery Planning Guidance, version 1.3. And it says, Recovery plans delineate such reasonable actions as may be necessary based upon the best scientific and commercial data available for the conservation and survival of listed species. And under when drafting recovery criteria, remember that they must be smart. And under the fourth bullet, it says, Realistic, grounded in good science, and defensible. And then in your regulation, notice 59 FR 34270-01. It says, The Act requires the services to make biological decisions based upon the best scientific and commercial data available. These decisions involve listing, reclassification, delisting of plant and animal species, critical habitat designations, recovery planning and implementation. And it, you know, goes on about independent peer review that also has to ensure best biological and commercial information available is used in the decision-making process. And then it just goes on. And it gives me a little pause that outside the context of litigation, you appear to have a very different view, which in my mind is the most logical one, that if the result must be based on the best available science, then the criteria to get there has to be based on the best available science. It just seems illogical that the criteria would not be based on best available science, but the result has to. I don't see how you get to that result without using a criteria that's consistent. Sure. So I appreciate the question, and I think I understand it, and there are a few responses to it. So first, with respect to the guidance, for example, that you read, that does describe best practices, that the agency does try to have strong scientific basis for all of the things that it does, but it is not an interpretive ruling. And I will also point this court to 85 Federal Register... But I'm sorry, it says the Act requires the services to make these decisions based on the best scientific and commercial data available. So my understanding is that if you look at 85 Federal Register 168, for example, it makes a firm distinction between the type of standard that applies at the delisting determination stage and what might apply at the recovery planning preliminary stage. And I'll point out that the recovery planning stage has expressed language. It does talk about, for example, objective and measurable criteria. It's trying to set and express by the statutory terms an express standard, or at least it's not a clear-cut, non-discretionary duty to the contrary, that's trying to say what you need to have in terms of some tethering to empirics or some tethering to science is you need to have objective and measurable criteria that at this preliminary stage you would have to have that requirement met, and that those things may have some connection to predictively, in terms of the agency's judgment, what might happen at the delisting determination stage. But as the D.C. Circuit ruled expressly, and I'll point this court, I think it's page 434, the star note there, it expressly talks about how the recovery criteria are not binding, and these plaintiffs have conceded that they do not, that departure from their prescriptions, for example, especially at the delisting stage, it's not required by the recovery criteria. They don't set what ultimately happens at the delisting stage. Those are distinct. They are governed by the specifically expressly set separate standard. But then how do you get to a result that is based on best available science if you're not using the criteria? You accidentally get to a result that is based on best available science, but you don't use best available science as the criteria to make that determination? Right, so there's scientific basis in the sense that there needs to be objective and measurable criteria, for example. These can't just be criteria that have no relationship to something that can be measured so that you could assess whether you're ultimately getting to the goal that the plan is aimed at. And so what I'm trying to say is that there's a different specific standard of what is expected because it's a very different and formal delisting determination stage as opposed to at the preliminary stage when the idea is that the agency is making a determination that in its predictive judgment these would be criteria founded, and in this case, for example, were founded on strong scientific basis. You know, there's extensive administrative record, public notice and comment, there's responses to those comments that I would let this court know that are in the district court record but are not as directly relevant here on the legal question before us on this appeal. But the point is, ultimately, that there are two different standards that's expressed in the statute, and at a minimum it's not a clear-cut nondiscretionary duty to do the exact high-level, cross-every-t, dot-every-i standard that would happen at the ultimate and formal determination stage, including, for example, at that FIBRI review delisting stage that was discussed from Coos County. If I may, I'd like to reserve some time for co-arguing counsel on this side of the issue. Oh, what is your co-counsel arguing? I'm sorry, what point? So they're representing a different client, they represent the New Mexico Department with their interests, if that's all right. Mr. Brent Erickson, we'll give you three minutes. Thank you. May it please the Court, Sven Brent Erickson for the New Mexico Department of Game and Fish. I want to start by pointing out that this appeal is not about Mexican wolf recovery efforts and whether they are working. The Mexican wolf is an ESA success story to date, starting as Judge Malloy pointed out, with seven captive wolves. They were reintroduced in the wild in 1998, and at latest count, there were 241 published by the U.S. Fish and Wildlife Service earlier this year. Population has doubled since this plan was adopted in 2017. This case is about using the Mexican wolf recovery plan as a vehicle for an argument about the scope of ESA citizen suits. Now, Section 4 of the ESA has several actions by the agency. The listing decisions, the delisting decisions, status reviews, those result in final agency actions, which are reviewable under the ESA and also under the Administrative Procedures Act. Recovery plans are not a final agency action. This was recently affirmed, as counsel for the government pointed out, Center for Biological Diversity versus Holland, a year 58-4-412, which was the Montana grizzly bear plan review. Reaffirmed, the recovery plans are not final agency actions. As a result, review is limited to the ESA citizen suit provision that allows review of nondiscretionary agency action. Even though we apply the APA standard review to ESA cases, that does not expand the scope of review. And so the citation to cases involving listing decisions, delisting decisions, where there is both ESA and APA review, and review for example of the outcome of agency decisions, is different and not applicable to this particular situation. Bennett v. Speer recognized this distinction, differentiating between the process that is followed versus the outcome of the process. What you have heard are arguments that basically the appellants here wish to argue about what the outcome of the process is, what the content of a recovery plan should be. Both of the arguments they're advancing are trying to reach into the substance of the recovery plan and try to basically make the case that they should be heard on what the substance of the recovery plan is, and that is not allowed under the ESA citizen suit provision. Both, and I'm going to hit just on the last point that was talked about on the best available science. They would ask that basically the criteria for both the recovery plan and a delisting decision be the same. They cannot be the same. If you think about when a recovery plan is developed, it's developed early in the process, with what we know about the species and where it should go. What we don't know at that time is ultimately when we should consider the species recovered. How do you know that if you don't have the best available science? You have what science you have available. You have to make decisions just as you have to make listing decisions based on the information you have available. You have to do what you can to chart a course. And I would also point out that as long as the species is listed, all of the protections of the ESA continue to apply to it. That's the distinction. Your position is objective measurable criteria does not involve the best available science. That's right. Because if you think about it, the protections of the ESA still apply to the species as long as it is listed. The distinction between the decision on content of a recovery plan and the decision to delist a species is that once it's delisted, those protections of the ESA are removed. So that protections of the ESA remain in place for all of the time that the species is listed, and while the work is being done to Could a plan bring a challenge to a recovery plan on the ground that the criteria it specifies are insufficiently objective or insufficiently measurable? Is that something that's reviewable? In essence, what you're asking is can they look at the adequacy of the criteria that have been established? Well, no. I'm asking whether they can look at whether the criteria are objective and measurable. Well, in essence, that's what was done here in looking at the measures that were being adopted. I mean, it was on looking at whether the measures that were adopted were specifically precise and the district court identified an element that didn't satisfy the criteria remanded, and the plan was revised And so you think that's permissible, but But not the, you know, if you look at the last two pages of the appellant's reply brief, they want to argue about how many populations and how many animals should be identified as the goal for a recovery plan. The way your co-counsel has presented it is that they're trying to raise scientific disputes about the evidence that was used. So I guess I don't understand. If you're saying whether objective measurable criteria was used as a non-discretionary procedural requirement, then I guess I don't understand how their scientific disputes don't fall within that. They're asking, they want to argue about what the answer should be. They're not asking, they are not disputing whether there are populations that should be identified, they're not disputing whether there should be a population target. They want to argue about what the actual target is. They want to argue about how many populations there should be. Those are the discretionary decisions, exercise of judgment, by the agency. In the Jewell case you identified, there was a failure to act. There was a failure to include conservation measures. There was just survival as an objective. So there was this discrete, identifiable element that was missing from the plan. As opposed to what is needed for conservation of the species. So what you cannot get into in the ESA citizen suit provision, non-discretionary review, is what actually is needed to recover  when it comes to a delisting decision. Thank you, Your Honor. I'd like to make three points. First, my friend said that this is distinguishable from 350 Montana because of the language express incorporation. I would submit that we have that sort of express language here to the extent it's necessary. On page 4 or 5, the recovery plan specifically states that it maintains the recovery strategy criteria and actions from the previous version of the plan. Also, though, express incorporation are not magic words. Again, the court is looking here for whether there's the same case or controversy. We're not arguing about the site specific management actions that were added anymore. That's not what's at issue in this case. What's at issue are claims related to whether the plan provides for conservation survival and whether the delisting criteria, which, again, were not added or changed in the plan, apply the best available science. Those claims are still live for this court. So I think counsel's point was that the changes that were made in adding the site specific criteria color the way that we would view the challenges that you're bringing. They don't. And actually, if you parse our complaint, our complaint to where specifically the plan doesn't provide for conservation survival have to do with three basic elements. The overall target population of wolves, the genetic criterion for those wolves, and the habitat suitability. None of that has to do with illegal killing. That was a completely separate claim of the complaint that is now resolved. So, again, there is still the same live case of controversy here. I also want to just talk about the practicalities that we would be talking about in having to file a new case. So you're talking about us having to go back to the district court, who's already ruled against us on these plain language statutory interpretation issues, where we would face preclusion, potentially. And to that point, if the court rules against us on mootness, we would respectfully request that you vacate those district court opinions. But we're also, again, then back at the district court on one of the most endangered mammals in North America. We filed this case in 2018, so we'd be waiting again, what, five, six more years after the five, six years we've waited so far, only to get back again to this court on the exact same issues. To borrow a phrase from the Supreme Court in Friends of the Earth vs. Laidlaw, that is more wasteful than frugal here. You said you had two other points. I asked you some questions. My second point is that conservation, my friend said, it's not a clear-cut duty. It is a clear-cut duty. It is actually defined by the statute. I would say, unlike the economic analysis duty that the court found in Bennett, which is not defined by statute, and indeed this is a duty that the court, including the district court, has parsed before, whether the 10-J management rule adequately provided for conservation. This court in Gifford-Pinchot also parsed what does conservation mean. This is a defined term that this court and others can review, in this case the recovery plan, for whether it adequately meets the need for conservation. To your point, Judge Miller, if we had a case about two animals, whether we have a case about two animals, 100 animals, 230 animals, all of these questions about whether that target provides for conservation should be equally reviewable. Whether we have an admission that it doesn't or it does, these are all questions that this court can apply the standard APA rulemaking standards for whether it was arbitrary and capricious to come to that determination that the plan provides for conservation survival. Just quickly to the last point, I just want to agree with Judge Koh that the delisting criteria in the recovery plan are what guides the agency towards the ultimate delisting. Those criteria have to be based on the best available science to guide the service in its mission to recover the Mexican wolf and other species. Again, we ask this court to remand and reverse the district court on these issues and appreciate this court's review. Thank you. We thank all counsel for their helpful arguments. The case is submitted and we are adjourned. Thank you.
judges: MILLER, KOH, Molloy